# EXHIBIT A

David Berke, SBN #123007
B E R K E S L A W
369 S. Doheny Dr., #508
Beverly Hills, California 90067
Telephone: (310) 251-0700
Email: david@berkeslaw.net
Attorneys for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES – WEST DISTRICT

| | |
|---|---|
| ROBERT J. CIPRIANI, an individual, | Case No.: 20SMCV00289 |
| Plaintiff, | [Unlimited Jurisdiction] |
| v. | **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| MGM RESORTS INTERNATIONAL., Inc., a Delaware corporation; and DOES 1- 25, inclusive, | 1. **NEGLIGENCE;** |
| Defendants. | 2. **BREACH OF IMPLIED CONTRACT;** |
| | 3. **INVASION OF PRIVACY;** |
| | 4. **VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE §§ 1750 et seq.);** |
| | 5. **VIOLATION OF CALIFORNIA CIVIL CODE §§ 1798.80 et seq.;** |
| | 6. **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 et seq.;** |
| | 7. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| | 8. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## PRELIMINARY ALLEGATIONS

Plaintiff Robert J. Cipriani ("Plaintiff" or "Mr. Cipriani") brings this action against defendant MGM Resorts International ("MGM" or "Defendant") and alleges, upon personal knowledge as to himself and upon information and belief as to all others, as follows:

1.      The present lawsuit is brought, in principal part, to vindicate the privacy, financial, and personal safety rights of Plaintiff, as a result of MGM's inability to secure its own Casino Management System. As detailed herein, due to MGM's gross negligence, acts of intentional interference and retaliatory targeting of the Plaintiff, Mr. Cipriani has suffered significant monetary and other damages, and has been effectively precluded from practicing his profession of over forty-three years, not just at the MGM, but around the world.

2.      As used herein, the term Personal Information ("PI") includes, but is not limited to, the PI which is routinely collected by MGM (and all other casinos) for purposes of maintaining a competitive advantage over their biggest spending customers, and usually includes, among other things, information such as the gambler's Social Security Number, telephone number(s), as well as the contents of inter-office notes regarding the gambler's playing habits, how much he spends, how much he brings in to the Casino, the frequency of visits, and any sort of sensitive intelligence that the Casino could use to evaluate and/or even manipulate the subject.

3.      While MGM (and other establishments) obviously collect personal information regarding their less storied guests, the PI thus collected from Mr. Cipriani and a handful of other "high-rollers" is obviously *highly confidential,* and should never been released to anyone outside MGM's upper-tier management executives. In the case of Plaintiff, however, these critical rules of confidentiality were subverted and abused.

4.      Beginning in or about the year 2001, Plaintiff has enjoyed a professional and personal relationship with MGM and various of its top executives, traveling to Defendant's numerous casinos as a guest but, more particularly, as a high-stakes blackjack player. Plaintiff, at all relevant times herein (including 2001 to the present) resided in Los Angeles, California. Throughout this relationship, MGM would regularly solicit Plaintiff's business, directing inducements to him in Los Angeles, attempting to outdo other competitor casinos. Thus, Plaintiff would regularly receive written

1

1  offers and other solicitations sent to him in Los Angeles by regular mail, via email, and over the

2  telephone. In addition, over the years Plaintiff has had several in-person meetings with MGM

3  executives in Los Angeles, pertaining to his play at Defendant's casinos.

4       5.     As part of its wooing of Plaintiff's business, on dozens of occasions MGM sent a

5  private jet to Los Angeles to pick Mr. Cipriani up for transport to its casinos. Better still, on May 31,

6  2018, MGM arranged to have Plaintiff throw out the first pitch at a Los Angeles Dodgers home game

7  – an incredible honor that Mr. Cipriani passed on to his wife – as part of its campaign to solicit

8  Plaintiff's gaming business and cement his loyalty. In a similar regard, MGM would arrange for

9  Plaintiff to attend various major sporting events and concerts taking place in Los Angeles.

10       6.     Specific to the violations of Plaintiff's privacy and PI set forth herein, these issues are

11  by no means somehow unknown to MGM. Indeed, as set forth in more detail below, there are records

12  of many months of direct communications (including numerous text messages) between Plaintiff and

13  MGM's chief general counsel which demonstrate that, despite (1) the supposed sophistication of

14  MGM's computer and security systems, (2) MGM's responsibilities under existing pertinent

15  regulations to maintain security of customer PI, and (3) its obligation to promptly deal with any

16  breach(es) of such confidential information, had it not been for Plaintiff's direct assistance, MGM

17  would demonstrate itself to be unable (or unwilling) to track down an MGM surveillance employee

18  who had repeatedly accessed and exploited Plaintiff's PI.

19       7.     In point of fact, Plaintiff was able to establish for MGM that this employee even

20  accessed Plaintiff's PI from *his own home* or other unauthorized locations outside the MGM computer

21  network. Accordingly, and despite all reassurances and representations to the contrary, MGM's

22  systems were, at all relevant times, decidedly not "closed," or otherwise secure and sufficient.

23       8.     Plaintiff is informed and believes and thereon alleges that a major motivation behind

24  MGM's concealment of the "open" and insecure status of its customer PI system is MGM's recent

25  championing of AnyVision, a facial recognition software system developed and marketed by an Israeli

26  technology firm known as AnyVision Interactive Technologies Ltd.

27       9.     In this same and further regard, Plaintiff is informed and believes, and thereon alleges,

28  that the AnyVision facial recognition system is not compatible with a "closed" computer/customer PI

2

1    system that would satisfy pertinent Nevada state (and other) regulations. Facial recognition systems

2    are top-shelf technology with multiple applications, such as enabling the operators to identify shoppers

3    walking in and around any one of MGM's innumerable retail venues, and then display advertisments

4    targeted for that particular shopper's demographic group(s) as they pass underneath digital billboards.

5        10.    This lawsuit is also brought because of the "bad-faith" ban MGM placed on Mr.

6    Cipriani in 2019. Thus, despite the assistance provided by Mr. Cipriani to MGM over a period of

7    many months to identify the MGM surveillance employee who was repeatedly accessing Plaintiff's PI,

8    and despite years of Cipriani's patronage of MGM casinos as a high-end gaming customer, on or about

9    November 19, 2019, MGM advised Cipriani via email that MGM was barring Cipriani permanently

10   from gambling at any MGM gaming locations worldwide, and also barring Cipriani from even setting

11   foot on any MGM property worldwide. Defendant did not state any reason or justification for barring

12   Cipriani, and Plaintiff believes that there was no rational or good-faith basis for doing so.

13       11.    Worse still, Plaintiff is informed and believes, and thereon alleges that, given the

14   closely-knit nature of the gaming industry in the United States and worldwide, and the custom and

15   practice of the major casino operators in the gaming industry, Defendants knew or reasonably should

16   have known that barring Plaintiff from gambling at or even entering MGM locations would cause all

17   other operators in the gaming industry (both in the United States and worldwide) to likewise bar Mr.

18   Cipriani permanently from gambling at *their* establishments (including venues such as casinos, cruise

19   ships, riverboats; essentially, anywhere that legal high-stakes gambling takes place).

20       12.    Simply stated, then, MGM succeeded in placing Mr. Cipriani on an industry-wide

21   "blacklist," without any rational, legal or other justification for doing so. And it did so, remarkably,

22   even after actively seeking – and receiving -- Plaintiff's assistance in identifying the very "leak" in its

23   security system that had resulted in the theft and misuse of Mr. Cipriani's PI in the first instance.

24   Whether MGM acted out of fear of eventual exposure, or to punish Plaintiff for uncovering

25   Defendant's dirty secrets, Mr. Cipriani is no longer able to practice his livelihood as a professional

26   gambler, a career which has spanned approximately four decades, practiced both in the United States

27   and elsewhere in the World. Mr. Cipriani has suffered significant monetary damages due to MGM's

28   improper conduct, and this action follows as a consequence.

3

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

## THE **PARTIES AND OTHER KEY PLAYERS**

2      13.     Plaintiff Robert J. Cipriana ("Plaintiff" or "Mr. Cipriani") is a resident and domiciliary

3   of the State of California, residing in Los Angeles County.

4      14.     Plaintiff is informed and believes, and thereon alleges that, defendant herein, MGM

5   Resorts International, Inc ("MGM") is a Delaware corporation doing business in Los Angeles County,

6   California, and around the globe, with its principal place of business located in Las Vegas, Nevada.

7   Employing the iconic historical symbol of MGM – "Leo," the Lion – MGM's website

8   (https://www.mgmresorts.com/en/company.html) describes the company as a "global entertainment

9   company with national and international locations featuring best-in-class hotels and casinos, state-of-

10  the-art meetings and conference spaces, incredible live and theatrical entertainment experiences, and

11  an extensive array of restaurant, nightlife and retail offerings."

12     15.     Plaintiff is informed and believes, and thereon alleges that, James J. Murren was the

13  chief executive officer of MGM, holding that position since approximately 2008 until February 2020.

14     16.     Plaintiff is informed and believes and thereon alleges that John M. McManus is the

15  chief general counsel, executive vice-president, and secretary of MGM, and has held such positions

16  since about 2010.

17     17.     Plaintiff is informed and believes, and thereon alleges that Robert H. Baldwin is the

18  former chief customer development officer of MGM, former chief executive officer of CityCenter (an

19  MGM owned venture), and is a former member of MGM's board of directors.  Plaintiff is further

20  informed and believes and thereon alleges that, more recently, after having relinquished his posts as a

21  director and/or officer of MGM, Baldwin has continued to work for MGM as a consultant, and has

22  continued to run private gaming operations involving high net worth individuals (including, in

23  particular, high limit poker games) taking place on MGM property, including but not limited to the

24  ARIA Resort and Casino ("ARIA").

25     18.     In this further regard, Plaintiff is informed and believes, and thereon alleges, that as part

26  of his role as chief customer development officer of MGM, Baldwin had complete access to the PI of

27  Plaintiff.  As a consequence, MGM had a heightened legal responsibility to ensure that employees

28  such as Baldwin would safeguard Plaintiff's PI, and take all necessary steps to prevent that PI from

4

1    being improperly accessed or otherwise compromised. Plaintiff is informed and believes, and thereon

2    alleges, that Baldwin still has access to Plaintiff's PI, despite having left MGM's employ.

3        19.    Plaintiff is informed and believes and thereon alleges that Steven M. Martinez is the

4    senior vice president of global security for MGM. As such, Plaintiff is informed and believes, and

5    thereon alleges, that the security and sufficiency of all MGM systems for the collection, storage,

6    protection and use of customer PI are directly within the scope of Martinez's executive duties and

7    hence are his personal, professional responsibility.

8        20.    Plaintiff is further informed and believes and thereon alleges that, prior to joining

9    MGM, Martinez worked for over two decades as a high ranking officer in the Federal Bureau of

10   Investigation ("FBI"), serving (among other positions) as executive assistant director of the FBI's

11   science and technology branch, head of the FBI's cyber division, and as head of the FBI's Los Angeles

12   and Las Vegas field offices. Plaintiff is informed and believes and thereon alleges that, as part of his

13   role at MGM, at all relevant times herein, Martinez has had complete access to the PI of Plaintiff, and

14   hence is charged with a significant degree of responsibility to safeguard that PI, and take all necessary

15   steps to prevent Plaintiff's PI from being improperly accessed or otherwise compromised.

16       21.    Plaintiff is informed and believes and thereon alleges that Angelo Bianco is an

17   executive vice president of customer development for MGM, involved in MGM's marketing and

18   gaming operations. For years, Bianco has served as Plaintiff's host/direct contact with respect to

19   Plaintiff's gaming activities and other patronage of MGM and its various locations. As such, Plaintiff

20   is informed and believes and thereon alleges that Mr. Bianco has been directly involved in and

21   responsible for the collection, storage, protection and use of the PI of Plaintiff.

22       22.    Plaintiff is ignorant of the true names and capacities of the defendants sued herein as

23   Does 1 through 25, inclusive, and therefore sues those defendants by such fictitious names. Plaintiff

24   will seek leave from the Court to amend this Complaint to allege their true names and capacities when

25   such information has been ascertained. Plaintiff is informed and believes and thereon alleges that each

26   of the defendants sued herein is responsible in some manner for the occurrences alleged herein, and

27   that Plaintiff's damages, as alleged herein, were legally caused by these defendants.

28

5

23.    Plaintiff is informed and believes,, and thereon alleges, that each of the defendants sued herein as Does 1 through 25, inclusive, at all times relevant herein, was the agent, employee, servant, representative, co-conspirator, director, officer, managing agent, supervisor, and/or co-venturer of each of the other Defendants, and was at all times relevant acting within the scope of said agency, venture, conspiracy, and/or employment with actual or ostensible authority and/or agency, and that each of the Defendants ratified the actions, omissions, and/or conduct of the others.

24.    The amount in controversy exceeds the jurisdictional minimum of this Court. Furthermore, this Court has personal jurisdiction over Defendant because MGM is a corporation authorized to do business in California, and that conducts substantial business in California.

25.    In this regard, there is a company by the name of Destron, Inc. ("Destron") , which is either a subsidiary of MGM, or a branch of Destron, Inc. in Nevada, or affiliated with MGM in some other corporate form. Destron is qualified to do business in California (California Secretary of State No. C1759979), with offices (Plaintiff believes) in Los Angeles, and an agent for service of process in Sacramento. Not coincidentally, the CEO of Destron, is William J. Hornbuckle, the CEO of MGM. Similarly, the Secretary of Destron is John McManus, the Chief General Counsel of MGM.

26.    In its latest Statement of Information filed with the California Secretary of State (on November 2, 2020), Destron lists "Marketing" under "Type of Business." Plaintiff is informed and believes and thereon alleges that, more particularly, the type of "Marketing" done by Destron is (ironically enough) managing the solicitation and organization of casino players traveling from Los Angeles to MGM's various locations.  Plaintiff is informed and believes, and thereon alleges, that MGM player reps with whom he dealt did business, from time to time, at or through Destron offices in Los Angeles.

27.    Venue in this Court is proper pursuant to section 395 of the Code of Civil Procedure because MGM solicits Plaintiff's business where he resides (in Los Angeles), and the vast majority of communications between Plaintiff and Defendant are conducted by Plaintiff from Los Angeles, including communications related to the precise subject matter of this action, as well as all negotiations concerning the terms of Plaintiff's travel to, and stays at, MGM properties. Meetings between the parties have occurred in Los Angeles, and it is in the interest of the Courts of Los Angeles

6

1  County to make certain that its residents are not being mistreated by national and international
2  organizations such as MGM.

3  **UNDERLYING FACTUAL ALLEGATIONS**

4       28.     Plaintiff Cipriani is a professional blackjack player who has been a customer of MGM
5  at its various gaming properties for decades. In or about 2011, Plaintiff began to work with the FBI as
6  a confidential human source, assisting the FBI with a high-level, extremely sensitive multi-year
7  investigation of an international drug cartel/gambling ring/money laundering operation. Ironically,
8  Plaintiff then himself came under suspicion from MGM security and compliance (and the security and
9  compliance departments of other gaming companies) of engaging in criminal conduct himself.

10      29.     Plaintiff's work with the FBI ultimately lead to the downfall of an international drug
11  trafficking organization which then in turn, remarkably enough, resulted in the apprehension of a top
12  Canadian Intelligence official, found to be guilty of espionage. This, all at great risk to Plaintiff and
13  his family. *See* https://www.cbc.ca/news/canada/cameron-ortis-investigation-rcmp-1.5827502

14      30.     Nonetheless, in or about 2011, MGM – operating the misapprehension that Mr. Cipriani
15  was actually himself engaged in criminal activity -- barred Plaintiff from entering or gambling at any
16  MGM properties worldwide for approximately seven years. Eventually, in or about January 2018, the
17  FBI provided Plaintiff with an official letter from the United States Department of Justice which
18  confirmed that Plaintiff was a *victim*, and not a *perpertrator*, of criminal activity and, as a result, in or
19  about February 2018, MGM removed any restrictions on Plaintiff's ability to enter or gamble at MGM
20  properties. A true and correct copy of the January 16, 2018 letter from the DOJ is attached hereto as
21  Exhibit 1, and incorporated by reference herein.

22      31.     Subsequent to his re-admission onto MGM properties in February 2018, Plaintiff had a
23  string of successful outings at Defendant's casinos. Yet, if MGM had carefully monitored Mr.
24  Cipriani's gambling activities in the past, such scrutiny only then became that much *more* acute
25  following his highly publicized involvement in bringing down an international drug trafficking
26  operation. Indeed, Plaintiff believes that certain MGM executives still harbored deep-seated
27  suspicions about Mr. Cipriani (despite the unusual intervention of the Department of Justice on his
28  behalf), and took his post February 2018 successes to be "evidence" of "cheating."

7

32.     Thus, in or about late May or early June 2018, Angelo Bianco (again, Plaintiff's host/direct contact at MGM) suddenly told Plaintiff that certain MGM senior executives had made a decision to euphimistically "put [Plaintiff] on the sidelines," allegedly so that MGM could investigate Plaintiff's recent play at the MGM Grand. When Plaintiff asked Bianco why MGM executives would want to investigate Plaintiff's play, Bianco responded, "They want to make sure everything is on the up-and-up."

33.     Incredulous, when Plaintiff asked for an explanation, Bianco remained decidedly coy, offering only that MGM "just wants to check things out." This, despite the presence of hundreds of "eye-in-the-sky cameras" watching every move the players make, along with closed circuit TV in the "shift room," as well as a phalanx of dealers and floor security personnel, Bianco's clear implication was that Plaintiff was indeed suspected of "cheating." He wasn't.

34.     In any event, on June 12, 2018, Mr. Bianco advised Plaintiff that MGM had completed its investigation, and welcomed Plaintiff to resume gambling at all MGM locations. But, then, the very next day (June 13, 2018), Bianco asked Plaintiff to accompany him to meet with a man by the name of London Swinney ("Swinney"), vice president of casino operations for MGM Grand, before returning to play at the casinos. Swinney told Plaintiff that he needed to "do certain things" once he resumed his play; more specifically, Swinney instructed Plaintiff that he was not to talk to other high net worth gamblers, and not to engage in conversations with MGM personnel. Plaintiff was understandably baffled by these instructions.

35.     Following the June 13, 2018 meeting with Swinney and Bianco, Plaintiff nonetheless resumed his customary gaming routine at the MGM Grand over the following six months. Yet, subsequently, on or about January 15, 2019, without any explanation or prior warning, MGM yet again barred Plaintiff again from entering or gambling at any MGM locations. The roller coaster ride continued. A true and correct copy of the January 15, 2018 letter from MGM is attached hereto as Exhibit 2, and incorporated by reference herein.

36.     On January 28, 2019, Plaintiff sent an email to MGM's CEO, Mr. Murren (the "January 28 Email"). Plaintiff copied other MGM executives on the January 28 Email, with "bcc's" to an FBI agent working in the FBI's Las Vegas field office, and to an employee of the Nevada Gaming Control

8

1    Board. In the January 28 Email, Plaintiff advised MGM, among other things, that he had witnessed

2    "inappropriate and illegal behavior going on at MGM properties."

3        37.    In this specific regard, Plaintiff told MGM that he had learned from former and current

4    MGM employees that the inappropriate and illegal behavior involved former Board member Baldwin,

5    and other MGM executives. Plaintiff suggested that MGM should conduct an independent

6    investigation of these matters, and promised to help MGM in any way he could.

7        38.    Later that same day, Plaintiff received an email from McManus, MGM's chief general

8    counsel. McManus reported to Plaintiff that MGM had started an investigation into Mr. Cipriani's

9    allegations, and asked if Plaintiff would be willing to share any additional information he had. What

10   followed was an involved series of communications and discussions – taking place over a six-month

11   period – comprised of one face-to-face meeting, numerous telephone discussions, and hundreds of text

12   messages, flowing between Plaintiff and McManus.

13        39.    In this same regard, on March 8, 2019, McManus flew to Los Angeles and met face-to-

14   face with Plaintiff for over three hours, at the office of a mutual friend. During that meeting, Plaintiff

15   disclosed to McManus sensitive and confidential information on various topics concerning

16   inappropriate and/or illegal activities occurring at MGM properties, involving present and former

17   MGM executives (including Mr. Baldwin and others), and certain MGM customers. Plaintiff and

18   McManus discussed the following topics (among others), reflecting what Plaintiff had been told by

19   various individuals (including present and former MGM employees), to wit, that:

20           a.   Baldwin and other MGM executives habitually lured unsuspecting high net worth

21                MGM customers (including, among others, NBA great Michael Jordan) to

22                controlled poker games, so that the customers could be "fleeced" by gamblers

23                working together in teams.

24           b.   Baldwin and other MGM executives would take high net worth MGM customers to

25                Shadow Creek, a luxury golf course owned by MGM, and play golf with the

26                customers for money, with the knowledge and assistance of Monte Montgomery,

27                the golf director at Shadow Creek. If Baldwin won, the customers would pay the

28

9

1      wager in cash. If Baldwin lost, he would later pay the customers with "play til' you

2      lose" "promo" chips issued by MGM.

3          c. Robert Saroli, a high net worth customer of MGM for years (known for "flat

4      betting" $300,000 per hand in card games at MGM locations), had been allowed to

5      run a "model search contest" on MGM property, notwithstanding the fact that

6      various MGM executives (including but not limited to Bianco) were fully aware

7      that Saroli used the model search contest as a vehicle for sexually harassing and

8      abusing numerous female contestants.

9          40.    At one point in their discussion, McManus told Plaintiff that he should not "worry

10     about" any past inappropriate or illegal activity by Baldwin, given that Baldwin was no longer

11     affiliated in any way with MGM. Standing alone, the dismissal of any concern over this alleged

12     conduct could hardly be justified by the fact that Baldwin supposedly no longer worked at MGM.

13     Even more to the point, however, Plaintiff is informed and believes, and thereon alleges, that

14     McManus' representation to Plaintiff regarding Baldwin was knowingly false when made, given that,

15     even after leaving his position as an officer of MGM, Baldwin was still a paid consultant for MGM,

16     pursuant to a separation agreement negotiated for Baldwin with MGM by Baldwin's attorney, David

17     Chesnoff (a high-powered Las Vegas criminal defense attorney).

18     **MONTHS OF DISCUSSIONS WITH McMANUS RE COMPROMISE OF**

19     **PLAINTIFF'S PI; MGM UTTERLY FAILS TO PROTECT PLAINTIFF'S PI FROM**

20     **UNLAWFUL ACCESS BY UNAUTHORIZED INDIVIDUALS INSIDE AND OUTSIDE**

21     **MGM**

22         41.    In his March-April 2019 communications with McManus, Plaintiff told McManus that

23     Plaintiff believed that various MGM employees, without authorization, were accessing Plaintiff's PI

24     on file with MGM, including but not limited to Plaintiff's "barred" status. In this regard, Plaintiff told

25     McManus that Plaintiff believed these individuals were selling Plaintiff's PI (including details of his

26     prior gaming activity) to MGM's competitors in the gaming industry in Las Vegas.

27         42.    Furthermore, Plaintiff told McManus that a particular individual employed by MGM in

28     the surveillance department was in touch with an acquaintance of Plaintiff, and was sharing

10

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   information with this individual that demonstrated unequivocally that the MGM surveillance

2   department employee had real-time access to Plaintiff's PI.

3       43.     The day following their Los Angeles meeting, on March 9, 2019, at 8:53 a.m., Plaintiff

4   forwarded McManus a text message that Plaintiff had received previously from his source on February

5   24, 2019. Plaintiff's source stated that he had recently dined with a friend who worked as a security

6   supervisor at an MGM location; the text message from the MGM security supervisor to Plaintiff's

7   contact *enclosed a screenshot of notes from Plaintiff's MGM account.*

8       44.     Subsequently, Plaintiff began to assist MGM in an effort to uncover the identity of the

9   individual who was accessing and leaking Plaintiff's PI. Parenthetically, it was baffling to Plaintiff

10  that MGM – with obviously superior access to its own systems, and vastly superior resources –

11  required any assistance from Plaintiff whatsoever. Indeed, as much as Plaintiff was rightfully

12  concerned about the privacy of his PI, MGM had an enormous stake in ensuring that its customers

13  could use MGM's facilities without fear of having their PI abused.

14      45.     On April 1, 2019, McManus texted Plaintiff: "I have not heard back yet if we have

15  figured out who the bad guy is. I hope to hear at some point today. Will let you know when I hear as

16  that is highly relevant to our discussion." A few minutes later, Plaintiff responded: "Don't forget we

17  can 'for sure' find out once you change my NO trespass status and he confirms it on MGM computer

18  to my source and then to me."

19      46.     During April 2019, MGM's General Counsel McManus and Head of Security (and

20  former FBI executive assistant director Martinez reported to Plaintiff that they were still unable to

21  locate the breach. On April 15, 2019, McManus texted Plaintiff: "Plan is to lift the trespass on every

22  property except MGM Grand for now. No gaming and I also want to discuss a few aspects with you.

23  Should be done in the next couple of days."

24      47.     Plaintiff is informed and believes, and thereupon alleges, that the reasons why MGM

25  relented in this fashion were (1) by way of an apology, and (2) much more importantly, by allowing

26  Plaintiff to return to MGM properties, it would assist him in discovering the indentity of the

27  individual(s) responsible for the security breach. On Friday, April 19, 2019, McManus texted Plaintiff:

28  "Trespass was lifted yesterday. I will get you letter on Monday. No gaming and please don't go to

11

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

MGM Grand (where the MGM "Mansion" is located, and where Plaintiff would naturally encounter MGM senior executives and high rollovers)."

48.     Plaintiff put the lifting of the "No Trespass" prohibition to good use, and was able to determine a likely source of the security breach, in particular, the MGM employee (who happened to be the Director of Security at MGM's Luxor Hotel) who had been illegaly accessing, using and sharing Plaintiff's PI. Plaintiff then communicated this information to MGM's General Counsel, John McManus.

49.     Ultimately, Plaintiff's efforts at identifying the leak lead to the employee's termination by MGM, but the damage was already done. In this specific regard, through direct communications with the individual responsible for the leak, Plaintiff is informed and believes and based thereon alleges that his PI had been breached on dozens of occasions (if not more), through the means of screenshots of Plaintiff's account that had been lifted from the MGM computer system. In this manner, the individual was able to learn such details as Plainitiff's gambling habits, frequency of visits, the amount and nature of "comps" he had been provided, and of course all of Mr. Cipriani's personal, private confidential information.

50.     Plaintiff is informed and believes, and based thereon alleges, that the leak at MGM provided Plaintiff's PI to multiple other gamblers either for their own personal competitive use, or to have an information that they could share with other gaming establishments to curry favor with them. Worse still, the MGM "leaker" explained to Plaintiff that there was a culture within the Las Vegas Security community at large whereby sensitive PI would be shared between different establishments, or individuals, as a sort of 'currency" or in-kind payment of favors and/or debts. The victims of this culture were, of course, high profile individuals like Mr. Cipriani.

51.     Just by way of example only, Plaintiff came to know that his PI had been given to a gambler by the name of Bill Krackonberger. With such information, Krackonberger was able to to align himself with multiple casino marketing executives around the globe, to gain their allegiance, and to provide traffic to his sports betting business, and gambling website. One example of a direct link between Krackonberger's illegal possession of Plaintiff's PI came to light when an individual approached Mr. Cipriani – with no formal introduction of any kind – who proposed a scheme whereby

12

1   he attempted to defraud Plaintiff out of millions of dollars. The fraudster admitted to Plaintiff that he

2   was working with Krackonberger.

3       52.     When Plaintiff discovered the attempted fraud, he described the events on his Twitter

4   feed. The fraudster then began telephoning Plaintiff, threatening to hit him and his wife over their head

5   with a baseball bat. At one point, the threats got so bad that Plaintiff put a telephone call from the

6   fraudster on speaker, so that it was heard by a former Las Vegs Metropolitan Police officer, who

7   recommended that Plaintiff contact law enforcement. Plaintiff called the FBI. As a precaution,

8   Plaintiff and his wife were forced to move from the place that they had lived for over a decade, so that

9   they would be more difficult to locate.

10      53.     As explained more fully below, Plaintiff was barred by MGM from all of its properties

11  in November 2019. But the negative consequences of the theft and dissemination of Plaintiff's PI

12  continued even *after* Mr. Cipriani was barred. Thus, in or about December 2019, Plaintiff was

13  introduced to a man named Jack Zwerner through a mutual acquaintance. Zwerner explained that if

14  Plaintiff would hire him as a "consultant" – at the cost of hundreds of thousands of dollars – Zwerner

15  would arrange for Plaintiff to be allowed back into the MGM.

16      54.     Not coincidentally, Zwerner's daughter is Jaqueline Zwerner Roberts who, Plaintiff is

17  informed and believes, is a VP of Marketing for the Bellagio Hotel, an MGM-owned property. When

18  asked how he knew about Plaintiff's problem with MGM, Zwerner told Plaintiff that between his

19  daughter and other people he knew at MGM, he could "find out anything." Suspicious, Plaintiff did

20  some digging and determined that Zwerner was engaged in criminal activity, and then called the FBI.

21  Needless to say, Plaintiff did not take Zwerner up on his offer of assistance.

22      55.     Zwerner became enraged when he learned that Plaintiff had found him out. Thereafter,

23  a package addressed to "RJ Cipriani" was hand-delivered by Zwerner (and an accomplice) to a

24  building located a block away from the residence that Plaintiff and his wife had *formerly* occupied, as

25  described in Paragraph 52, above. Whoever delivered the package had mistakenly believed that

26  Plaintiff lived at that address.

27      56.     The concierge of the building where the delivery was made was able to locate Mr.

28  Cipriani, and told him that a package had been left with her, with instructions to deliver it to Plaintiff.

13

1   Mr. Cipriani asked the concierge to describe the package, and was told that it had been partially

2   opened when delivered, and that there was a computer visible inside. Plaintiff instructed the concierge

3   to put the package in a safe place, and assured her that he was going to contact the Santa Monica bomb

4   squad. He did so. Plaintiff and his wife received numerous threatening phone calls throughout that

5   night, and he went to the Santa Monica Police Dept. the next day to fill out an Incident Report.

## MGM BARS PLAINTIFF AGAIN FROM GAMING OR ENTERING ITS LOCATIONS

8       57.    Plaintiff had grown tired of suffering the consequences of MGM's unfounded

9   suspicions, and the roller coaster ride of being allowed, and then disallowed, from gambling at the

10   MGM. Indeed, MGM showed itself to be more than happy to enjoy the fruits of Plaintiff's

11   investigative assistance, without any sort of consideration or compensation to Mr. Cipriani. As a

12   result, in or about September 2019, Plaintiff sent a draft complaint to MGM, in the hope of jump-

13   starting a negotiated conclusion to this never-ending battle. On or about November 19, 2019, MGM

14   responded with a letter emailed to Plaintiff from its corporate compliance department, stating that

15   "MGM Resorts International management has determined, after careful consideration, that it no longer

16   desires to accept your business as a customer at its properties[.]" The letter also stated that Plaintiff's

17   "barred status" applied to both gaming and non-gaming activities.

18       58.    Plaintiff is informed and believes, and based thereon alleges, that Defendants

19   maliciously decided to bar Plaintiff from all MGM properties in order to retaliate against Plaintiff for

20   (a) having raised with McManus, starting in March 2019, the serious issues arising from the invasion

21   and compromise of Plaintiff's PI in MGM's customer information systems, and (b) having complained

22   to McManus that even though the employee thought to be the one accessing MGM client PI (including

23   Plaintiff's) was suspended by MGM in August 2019, it was apparent that unauthorized access and

24   exploitation of Plaintiff's PI was continuing.

25       59.    Plaintiff is further informed and believes, and based thereon alleges, that despite the

26   express clearance provided him by the DOJ, the top brass at MGM continued to harbor the mistaken

27   belief that Mr. Cipriani was guilty of significant criminal activity, and their prejudice towards him

28   never waned. At the end of the day, therefore, the simplest solution for MGM was to bar Plaintiff, and

1   thereby sweep everything – including Plaintiff's discovery of MGM's porous security system – under
2   the proverbial rug. The ultimate result for Plaintiff has been devastating.

3       60.    Thus, when a high-stakes gambler decides to visit Las Vegas (or another gaming
4   location), s/he doesn't hop a Southwestern flight and take a cab to the casino. Instead, high-end
5   players such as Mr. Cipriani engage the services of vendors commonly referred to as "player reps,"
6   who contact the various casinos and advise the establishment that the player they are representing
7   would like to visit. The rep then seeks to determine what kind of "deal" the casino will offer, including
8   such details as the type of transportation, if any (such as a private jet), the accomodations (suite, villa,
9   and so forth), the amount of complimentary "promo chips" the gambler could expect, any discount on
10  losses the casino was willing to provide, and the entertainment (dinners, shows, events, *etc*.) being
11  offered. Based at least in part on the perks being offered, the gambler then decides whether or not s/he
12  wants to stay at a particular location.

13      61.    As a result of being barred by MGM, however, Plaintiff no longer is able to gamble at
14  *any* of the establishments suitable for his level of play, or enjoy any of the perks that are offered as a
15  result. By way of example only, the following casinos have expressly refused Plaintiff's business
16  since November 2019: Caesar's (all properties), Wynn (all properties), all Las Vegas Sands Corp.
17  properties globally (including the Venetian, Palazzo, *etc*), various Indian casinos, cruise ships, and
18  other casinos around the world located in places like London, Monte Carlo, Asia, and so forth. And
19  then, of course, it is MGM and all of its properties (such as the Bellagio, the MGM Grand, and many
20  others). Moreover, it isn't just gambling that has been prohibited; indeed, Mr. Cipriani isn't even
21  permitted to enjoy a hamburger at an MGM Resort hotel delicatessen.

22      62.    Simply stated, a "bar" by MGM Resorts is the proverbial "death sentence" when
23  applied worldwide to high-profile, high-stakes gamblers, like Plaintiff herein. Mr. Cipriani has been
24  precluded from pursuing his chosen vocation due to MGM's capricious decision, and with it, his
25  ability to use his winnings to engage in charitable activities such as he has done in the past. Indeed,
26  Plaintiff's moniker "Robin Hood 702," is a reference to Mr. Ciprani's habit over the years of donating
27  in excess of $1 million+ of his winnings at the blackjack tables to charitable organizations, and
28  families in need. By barring Plaintiff, MGM is preventing Mr. Cipriani from practicing his vocation –

15

1  playing high-stakes blackjack – and his avocation, giving to the poor and needy. This action follows as
2  a consequence.

3  **FIRST CAUSE OF ACTION**

4  **(Negligence Against Defendant MGM, and Does 1 through 25, inclusive)**

5      63.    Plaintiff repeats and realleges paragraphs 1 through 62, inclusive, as though fully set
6  forth herein.

7      64.    Plaintiff is informed and believes, and based thereon alleges, that a special relationship
8  exists between Defendant MGM and Plaintiff, borne of many years of patronage by Plaintiff at
9  MGM's casinos and Hotels as a high-stakes gambler. Over the course of many years, Defendant
10 actively solicited Plaintiff's business while he was Los Angeles, and then required him to provide his
11 PI to MGM and to use his PI in gaming and other transactions at MGM's various locations, including
12 but not limited to MGM Grand and other MGM locations.

13     65.    When Plaintiff provided his PI to Defendant MGM to facilitate and close transactions,
14 such as depositing or withdrawing funds from the casino, Plaintiff did so with the reasonable
15 understanding and expectation that MGM had adequate and reasonable security measures in place, and
16 that Defendant MGM would take reasonable steps to protect and safeguard the PI of Plaintiff. Plaintiff
17 also gave his PI to MGM based on the reasonable presumption that Defendant was in a superior
18 position to protect against unauthorized access, theft, and/or misuse of that PI and the harms that such
19 compromising of the PI would cause.

20     66.    Upon gaining access to the PI of Plaintiff, Defendant MGM owed to Plaintiff a duty of
21 reasonable care in handling and using the PI, and securing and protecting the PI from being stolen,
22 accessed or otherwise misused by unauthorized persons. Pursuant to that duty, MGM was required to
23 design, maintain and test their security systems to ensure that these systems were reasonably airtight
24 and hence capable of protecting the PI of Plaintiff. Defendant further owed to Plaintiff a duty to
25 implement systems and procedures that would detect a breach of their security systems in a timely
26 manner, and to timely act upon any alerts from such systems.

27     67.    Defendant MGM owed this duty to Plaintiff because Defendants should have been
28 aware that Plaintiff could and would be injured by Defendant's inadequate security protocols. After

1  all, Defendants had actively solicited Plaintiff to use his PI in gaming and other transactions at MGM's

2  locations, and, to facilitate and close those transactions, Defendants used, handled, gathered and stored

3  the PI of Plaintiff. While Defendants solicited, used and stored the PI, Defendants concurrently knew

4  (or should have known) that their computer system's security practices were inadequate, and

5  Defendants also knew (or should have known) that certain unauthorized individuals within (as well as

6  outside) MGM's organization routinely attempted to access, steal, misuse or otherwise compromise

7  the PI that Defendants had solicited and obtained from Plaintiff. As such, Defendants knew a breach

8  of their systems would cause damage to their customers, including Plaintiff. Accordingly, Defendants

9  had a duty to act reasonably in protecting the sensitive PI of their customers, including Plaintiff.

10       68.     Defendants also owed a duty to timely and accurately disclose to Plaintiff the scope,

11  nature, and occurrence of any breach involving the PI. This duty was required and necessary in order

12  for Plaintiff to take appropriate measures to safeguard his personal and financial safety, to avoid

13  unauthorized charges to credit and/or debit accounts, cancel and/or change usernames and passwords

14  on compromised accounts, monitor his accounts to prevent fraudulent activity, contact his respective

15  financial institutions about actual or possible compromise of the PI, obtain credit monitoring services

16  and/or take other reasonable steps to mitigate the harms caused by Defendant's negligent conduct.

17       69.     Defendant breached their duties to Plaintiff by failing to implement and maintain

18  security systems and controls that were capable of adequately protecting the PI of Plaintiff. Even

19  more specifically, Defendants breached their duties to Plaintiff by failing to remedy the deficiencies

20  found in various access points to MGM's computer systems and corporate networks, and by storing

21  Plaintiff's PI on their computer systems and corporate networks.

22       70.     Defendants further breached their duties to Plaintiff when they failed to fix the

23  deficiencies associated with their security and storage policies and procedures, despite the fact that

24  Defendants knew or, at the very least, should have known that these deficiencies were causing data

25  breach and the theft or compromise of sensitive PI belonging to Plaintiff. Defendants also breached

26  their duties to timely and accurately disclose to Plaintiff that his PI had been or was reasonably

27  believed to have been improperly accessed, stolen, or otherwise compromised. Indeed, this is all the

28  more true given Plaintiff's active role in assisting MGM to locate the source of its breach.

17

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

71.     The injuries to Plaintiff were reasonably foreseeable to Defendants, because Defendants knew or should have known that their security practices were inadequate and unreasonable concerning their computer systems, and Defendants also knew that certain unauthorized individuals within (as well as outside) MGM's organization routinely attempted to access, steal, misuse or otherwise compromise the PI that Defendants had solicited and obtained from Plaintiff. As such, Defendants' own misconduct created a foreseeable risk of harm to Plaintiff.

72.     Defendants' failure to take reasonable steps to protect the PI of Plaintiff was a proximate cause of Plaintiff's injuries because (a) it has allowed unauthorized persons inside and outside the MGM organization, including but not limited to hackers, easy access to the PI of Plaintiff, and (b) this ease of access has allowed unauthorized persons, including but not limited to hackers, the opportunity to implement unsophisticated attacks and thereafter steal, access, or otherwise compromise the PI of Plaintiff and disseminate it over black markets.

73.     In summary, Plaintiff has suffered and continues to suffer actual harms for which he is entitled to compensation, including:

    a. Trespass, damage to, and theft of his personal property, *i.e.*, his PI;

    b. Improper disclosure of his PI;

    c. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by his PI being placed in the hands of unauthorized persons and having been already misused;

    d. Damages flowing from Defendants' failure to timely or adequately notify Plaintiff of the breach of his PI;

    e. Loss of privacy suffered as a result of the breach of his PI, including the harm of knowing cyber criminals have or inevitably will have Plaintiff's PI;

    f. Ascertainable losses in the form of out-of-pocket expenses and the value of Plaintiff's time reasonably expended to remedy or mitigate the effects of the breach of Plaintiff's PI;

18

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

g.  Ascertainable losses in the form of deprivation of the value of Plaintiff's personal

information, for which there is a well-established and quantifiable national and

international market;

h.  Damage to Plaintiff's credit due to fraudulent use of his PI; and

i.  Increased cost of borrowing, insurance, deposits and other items which are

adversely affected by reduced credit scores; and

j.  Great personal danger to Plaintiff and his wife, one example of which is more fully

described in Paragraphs 51 and 52, above, and Paragraph 74 below.

74.     Moreover, Plaintiff has an interest in ensuring that his PI, which remains in the

possession of MGM despite his "barred" status, is protected from further breaches by the

implementation of appropriate security measures and safeguards.

75.     As a direct proximate result of Defendants' negligent misconduct, Plaintiff has suffered

theft and compromise of his PI. In this regard, Defendants have allowed cybercriminals access to

Plaintiff's PI, thereby decreasing the security of Plaintiff's credit, debit and other accounts, making

Plaintiff's identity less secure and reliable, and subjecting Plaintiff to the imminent threat of identity

theft. Not only will Plaintiff be forced to incur time, money and effort to re-secure his banking

information and identity, but he will also have to protect against the specter of identity theft for years

to come.

76.     Once again, as a separate (but nonetheless foreseeable by Defendants) example and

species of injury proximately caused by Defendants' negligence, as alleged in more detail above, when

in or about September 2019, Plaintiff was contacted and targeted by the fraudster who had been led to

Mr. Cipriani through the misuse of his PI. Since receiving death threats from this individual, Plaintiff

and his wife have had to leave the building in Santa Monica where they had resided for many years,

incurring great personal financial expense and trouble. Additionally, as would any reasonable person,

Plaintiff and his wife have experienced and continue to experience significant physical, mental and

emotional distress, pain, fear and dread from the threats on their lives made by Cardone, which were

directly and proximately caused by Defendants' failure to safeguard Plaintiff's PI.

1    77.    As a direct and proximate result of the foregoing negligent conduct by Defendants,

2   Plaintiff has been damaged in an amount to be demonstrated according to proof at trial, but at a

3   minimum, compensatory damages beyond the jurisdictional threshold of this Court, as well as other

4   incidental and consequential damages.

5                              **SECOND CAUSE OF ACTION**

6   **(Breach of Implied Contract Against Defendant MGM, and Does 1 through 25, inclusive)**

7    78.    Plaintiff repeats and realleges paragraphs 1 through 77, inclusive, as though fully set

8   forth herein.

9    79.    Plaintiff is informed and believes and thereon alleges that Defendants actively solicited

10   the PI of Plaintiff by offering Plaintiff the option of establishing customer accounts with MGM at or

11   through one or more of its various properties, for use in gaming and/or non-gaming transactions,

12   including but not limited to through the use of credit and/or debit cards for various purposes.

13    80.    Each purchase or expenditure by Plaintiff with MGM at or through one or more of its

14   various properties was made pursuant to mutually agreed upon implied contractual terms that

15   Defendants would take reasonable measures to protect the PI of Plaintiff, and that Defendants would

16   timely and accurately notify Plaintiff if and when such information was compromised in any manner.

17    81.    Had such implied contractual terms failed to exist, Plaintiff never would have

18   established customer accounts with MGM for use in gaming and/or non-gaming transactions,

19   including but not limited to supplying his PI, never would have used his credit and/or debit cards to

20   make purchases or engage in gaming at MGM locations, and as a more general matter never would

21   have entrusted his PI to Defendants for use and storage. As explained throughout this Complaint, the

22   misuse of Plaintiff's PI in the hands of unauthorized individuals placed Plaintiff at great risk.

23    82.    Plaintiff fully performed his obligations under the implied contractual terms, including

24   the provision of accurate and timely personal information requested by MGM, including updates

25   thereof.

26    83.    In contrast, Defendants breached the implied terms of the contract they made with

27   Plaintiff by failing to reasonably protect his PI and by failing to provide adequate notice of any

28   breaches and unauthorized access of such sensitive information.

84.     As a direct and proximate result of the material breaches of this implied contract by Defendant, Plaintiff has been damaged in an amount to be demonstrated according to proof at trial, but at a minimum, compensatory damages beyond the jurisdictional threshold of this Court, as well as other incidental and consequential damages and reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### (Invasion of Privacy (Cal. Const. Art. I, § 1) Against

### Defendant MGM and Does 1 through 25, inclusive)

85.     Plaintiff repeats and realleges paragraphs 1 through 84, inclusive, as though fully set forth herein.

86.     Plaintiff is informed and believes and thereon alleges that Defendant MGM, in committing the actions and omissions alleged herein, without the informed consent of Plaintiff, violated his right to privacy established in Article I, Section 1 of the California Constitution.

87.     Plaintiff maintain a legally protected privacy interest in his PI collected, stored and used by Defendants. Defendants knew, or reasonably should have known, that Plaintiff had and has a reasonable expectation of privacy in his PI, and that Defendants' collection, storage and use of that PI, while failing to prevent unauthorized persons within (as well as outside) the MGM organization from stealing, accessing, or otherwise compromising the PI, constituted violations of Plaintiff's constitutionally protected right to privacy.

88.     Plaintiff is informed and believes and thereon alleges that Defendants' wrongful conduct as alleged herein, without regard to whether Defendants acted intentionally or with any other particular state of mind or scienter, renders Defendants liable to Plaintiff for their wrongful violations of Plaintiff's constitutionally protected right to privacy and for the damages caused by those violations. In committing the actions and omissions alleged herein, Defendants acted intentionally or with conscious disregard for the right to privacy of Plaintiff.

89.     As a proximate and direct result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount to be demonstrated according to proof at trial, but at a minimum, compensatory damages beyond the jurisdictional threshold of this Court, as well as other incidental and consequential

21

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   damages. Furthermore, Plaintiff seeks to enjoin Defendants from further holding, storing,

2   disseminating, or allowing unauthorized persons to access the PI of Plaintiff.

3                               **FOURTH CAUSE OF ACTION**

4        **(Violation of California Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.)**

5                   **Against Defendant MGM, and Does 1 through 25, inclusive)**

6        90.     Plaintiff repeats and realleges paragraphs 1 through 89, inclusive, as though fully set

7   forth herein.

8        91.     In California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§1750, *et*

9   *seq.*, the statute proscribes "unfair methods of competition and unfair or deceptive acts or practices

10  undertaken by any person in a transaction intended to result or which results in the sale or lease of

11  goods or services to any consumer."

12       92.     Plaintiff, in the course of his gaming and non-gaming transactions at one or more MGM

13  properties, purchased or leased "goods" and or "services" from Defendants, within the ambit of Cal.

14  Civ. Code §§1761(a) and 1761(b).

15       93.     Plaintiff is a "consumer" as defined in Cal. Civ. Code § 1761(d). Plaintiff and

16  Defendants are "persons" as defined in Cal. Civ. Code § 1761(d).

17       94.     As alleged above, Defendants made representations concerning the sufficiency, safety

18  and integrity of the electronic and other systems used by MGM to acquire, store, maintain and use

19  Plaintiff's customer PI.

20       95.     In purchasing goods and services from Defendants, Plaintiff was deceived by

21  Defendants' failure to disclose that the sufficiency, safety and integrity of the electronic and other

22  systems used by MGM to acquire, store, maintain and use Plaintiff's customer PI were inadequate, and

23  that individuals both inside and outside the MGM organization had the ability and, indeed, did access

24  Plaintiff's customer PI.

25       96.     Defendants' conduct, as described above, was and is in violation of the CLRA.

26       97.     Plaintiff has suffered injury in fact and actual damages resulting from Defendants'

27  material omissions and representations, including but not limited to the fact that Plaintiff was induced

28

                                          22
                  COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  to purchase goods and services from Defendants, instead of MGM's numerous competitors, whose

2  security systems – Plaintiff is informed and believes -- were superior to those employed by MGM.

3      98.    Defendant knew, should have known, or was reckless in not knowing that the

4  sufficiency, safety and integrity of the electronic and other systems used by MGM to acquire, store,

5  maintain and use Plaintiff's customer PI were inadequate, and that individuals both inside and outside

6  the MGM organization had the ability and, indeed, did access Plaintiff's customer PI.

7      99.    The facts concealed and omitted by Defendants with respect to Plaintiff are material, in

8  that a reasonable consumer would have considered such facts to be important in deciding whether to

9  purchase or goods and services from Defendants, or to take his business to MGM's numerous

10  competitors, who are lined up and down the Las Vegas Strip.

11      100.    Plaintiff gave notice to Defendants of their violations of the CLRA within the ambit of

12  Cal. Civ. Code 1782(a). More than thirty days have passed, and Defendants failed to take any

13  corrective action as required.

14      101.    Plaintiff has suffered injuries that were proximately caused by Defendants' fraudulent

15  and/or deceptive business practices. Therefore, Plaintiff is entitled to monetary and equitable relief, as

16  well as monetary damages, pursuant to the CLRA.

17                    **FIFTH CAUSE OF ACTION**

18      **(Violation of California Customer Records Breach Notification Statute (Cal. Civ.**

19      **Code §§ 1798.80 et seq.) Against Defendant MGM, and Does 1 through 25, inclusive)**

20      102.    Plaintiff repeats and realleges paragraphs 1 through 101, inclusive, as though fully set

21  forth.

22      103.    The breaches of Plaintiff's customer PI alleged hereinabove constitute breaches of

23  Defendants' computer security systems within the meaning of Cal. Civ. Code § 1798.82, and the

24  information belonging to Plaintiff was protected and covered by Cal. Civ. Code § 1798.80(e).

25      104.    Defendants unreasonably delayed notification of the breaches, including the

26  unauthorized access and theft of PI of their customer (Plaintiff, *i.e.*), after Defendants knew or

27  reasonably should have known that such breaches had occurred.

28

23
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    105.    Defendants took no action to remedy the breaches, or otherwise to ensure that their

2    systems were properly protecting Plaintiff's PI.

3    106.    Plaintiff is informed and believes and thereon alleges that no law enforcement agency

4    instructed Defendants to withhold notification and/or disclosure of the breaches.

5    107.    As a result of Defendants' failure to notify in a statutorily prescribed time period or

6    other reasonable time period, Plaintiff has suffered direct harm, as alleged herein above.

7    108.    Had Defendants provided timely and accurate notice, Plaintiff could have taken step to

8    mitigate the direct harm suffered as a result of Defendants' failure to provide notice.

9    109.    Plaintiff seeks all remedies available under the applicable California statute, Civ. Code

10   § 1798.84, including but not limited to damages as alleged above, equitable relief, civil penalties,

11   attorneys' fees and costs.

12                              **SIXTH CAUSE OF ACTION**

13                **(Violation of California Unfair Competition Law (Cal. Bus. & Prof.**

14      **Code §§ 17200, *et seq*.) Against Defendant MGM, , and Does 1 through 25, inclusive)**

15   110.    Plaintiff repeats and realleges paragraphs 1 through 109, inclusive, as though fully set

16   forth herein.

17   111.    Plaintiff is informed and believes and based thereon alleges that Defendants have

18   engaged in unlawful, unfair, or fraudulent acts or practices, which constitute unfair competition within

19   the meaning of Section 17200 of the California Business and Professions Code.

20   112.    Specifically, Plaintiff is informed and believes and thereon alleges that Defendants

21   have violated the following laws:

22          a. Cal. Civ. Code § 1798.82(a), which requires Defendants to disclose a breach of the

23             security of its systems and issue a security breach notification to all those

24             individuals affected in the most expedient time possible and without unreasonable

25             delay;

26          b. Cal. Civ. Code § 1798.81.5(b), which requires Defendants to implement and

27             maintain reasonable security procedures and practices appropriate to the nature of

28

                                            24

1            the information, to protect such information from unauthorized access, destruction,

2            use, modification, or disclosure.

3      113.    Defendants intentionally or negligently violated Cal. Civ. Code § 1798.82, in failing to

4 expediently notify Plaintiff in a timely fashion concerning the breach of its security system and, more

5 specifically the theft of Plaintiff's PI.

6      114.    Defendants also have engaged in unlawful, unfair, or fraudulent acts or practices

7 constituting unfair competition by their decision to bar Plaintiff from gaming at (or even setting foot

8 on) any and all MGM properties worldwide, given that Defendants' decision was not based upon any

9 objective or rational business purpose, or upon any improper conduct by Plaintiff. Rather, as Plaintiff

10 has alleged herein, Defendants' decision to bar Plaintiff from any and all MGM properties worldwide

11 was punitive and retaliatory, designed to punish Plaintiff for having requested MGM management to

12 investigate and correct certain facts and circumstances concerning improper and/or unlawful activity at

13 MGM properties involving MGM personnel over time, and to discourage Plaintiff from drawing

14 further attention to the matters he had raised with MGM management, and as a result of an ongoing

15 (and unfounded) suspicion regarding alleged criminal activities.

16      115.    Plaintiff seeks all remedies available pursuant to California unfair competition law,

17 including but not limited to injunctive and equitable relief, civil penalties, and attorneys' fees and

18 costs. By way of example, Defendants should be preliminarily and permanently enjoined to take all

19 necessary steps to safeguard Plaintiff's PI, including by making whatever changes are needed to render

20 MGM's computer and customer information systems genuinely "closed," which Plaintiff is informed

21 and believes and thereon alleges was already required of MGM for the protection of Plaintiff and other

22 customers.

23                            **SEVENTH CAUSE OF ACTION**

24     **(Negligent Interference With Prospective Economic Advantage Against Defendant**

25                 **MGM, , and Does 1 through 25, inclusive)**

26      116.    Plaintiff repeats and realleges paragraphs 1 through 115, inclusive, as though fully set

27 forth herein.

28

117.    At all times relevant, Defendants knew or reasonably should have known that Plaintiff, as a professional gambler, had existing and/or prospective economic relationships with MGM's competitors in the gaming industry that contained the probability of future economic benefit to Plaintiff. Furthermore, at all times relevant, Defendants knew or reasonably should have known that Plaintiff's economic relationships with MGM's competitors in the gaming industry would be disrupted if Defendants failed to act with reasonable care.

118.    As alleged herein, by and through their decision to bar Plaintiff permanently from gaming at or entering any or all of MGM's properties worldwide, Defendants failed to act with reasonable care with respect to Plaintiff. Since Defendants' imposition of the bar on Plaintiff, Plaintiff has attempted to, but has not been permitted to gamble at locations belonging to MGM's competitors, demonstrating actual disruption of Plaintiff's existing and/or prospective economic relationships with MGM's competitors in the gaming industry as a result of Defendants' failure to act with reasonable care, as detailed in Paragraphs 58-60, above.

119.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff has been unable to practice his livelihood, and is entitled to recover compensatory, actual and general damages against Defendants according to proof at trial.

## EIGHTH CAUSE OF ACTION

### (Intentional Interference With Prospective Economic Advantage

### Against Defendant MGM, and Does 1 through 25, inclusive)

120.    Plaintiff repeats and realleges paragraphs 1 through 119, inclusive, as though fully set forth herein.

121.    At all times relevant, Defendants knew or reasonably should have known that Plaintiff, as a professional gambler, had existing and/or prospective economic relationships with MGM's competitors in the gaming industry that contained the probability of future economic benefit to Plaintiff. Furthermore, at all times relevant, Defendants knew or reasonably should have known that Plaintiff's economic relationships with MGM's competitors in the gaming industry would be disrupted if Defendants barred Plaintiff from gaming or entering any or all of MGM's properties worldwide.

1  Indeed, MGM executives were expressly made aware of the fact that Plaintiff gambled at

2  establishments other than those owned by MGM.

3      122.   As alleged herein, by and through their arbitrary, retaliatory decision to bar Plaintiff

4  permanently from gaming at or entering any or all of MGM's properties worldwide, Defendant

5  intentionally committed wrongful acts against Plaintiff that it knew (or should have known) would

6  result in Plaintiff's exclusion from casinos and gaming establishments worldwide.  Since Defendant's

7  imposition of the bar on Plaintiff, Plaintiff has attempted to, but has not been permitted to gamble at

8  locations belonging to MGM's competitors, demonstrating actual disruption of Plaintiff's existing

9  and/or prospective economic relationships with MGM's competitors in the gaming industry as a result

10  of Defendant's wrongful acts.

11      123.   As a direct and proximate result of Defendant's wrongful and intentional actions,

12  Plaintiff has been unable to practice his livelihood, and is entitled to recover compensatory, actual and

13  general damages against Defendants according to proof at trial.

14      124.   Defendant's actions with respect to Plaintiff were intentional, fraudulent, oppressive,

15  and malicious, undertaken with an intent to destroy Plaintiff's livelihood.  Such conduct entitles

16  Plaintiff to an award of punitive or exemplary damages, according to proof at trial.

17  **PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, and

19  respectfully requests that the Court grant the following relief, as set forth below.

20      A. An order temporarily and permanently enjoining Defendants from continuing the unlawful,

21         deceptive, fraudulent, and unfair business practices alleged in this Complaint;

22      B. Award statutory damages and actual damages;

23      C. Award compensatory and general damages according to proof at trial;

24      D. Impose civil penalties and court costs as may be determined, as well as restitution and

25         disgorgement as may be determined at trial;

26      E. Award Plaintiff is reasonable costs and attorneys' fees;

27      F. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts

28         awarded; and

1    G. Grant any other and further relief that the Court may deem fit and proper.

2

3    Dated: December 31, 2020                              B E R K E S L A W

4

5                                          By:

6                                                David Berke
                                                 Attorneys for plaintiff
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          28

EXHIBIT 1



**U.S. Department of Justice**

*ADAM L. BRAVERMAN*
*United States Attorney*
*Southern District of California*

*Andrew P. Young*                                          *(619) 546-7981*
*Assistant U.S. Attorney*

---

San Diego County Office                                   *Imperial County Office*
*Federal Office Building*                                  *516 Industry Way*
*880 Front Street, Room 6293*                              *Suite C*
*San Diego, California 92101-8893*                         *Imperial County, California 92251-5782*

January 16, 2018

To Whom It May Concern:

I am the lead prosecutor in the criminal prosecution of *United States vs. Owen Hanson, et al* (Case No. 15cr2310). On December 15, 2017, a federal court in the Southern District of California sentenced Owen Hanson to serve 21 years in prison for his role leading an illegal gambling and drug trafficking organization in violation of federal racketeering laws. Part of the criminal conviction stemmed from a widely reported incident that occurred in Sydney, Australia at the Star Casino in approximately August 2011 involving Owen Hanson and Robert Cipriani (aka Robin Hood 702). For several years after the August 2011 incident, Mr. Hanson threatened Mr. Cipriani and his family.

During the sentencing, Mr. Cipriani spoke at length about the effect Hanson's threats had on him and his family. The government and the Court permitted him to speak at Hanson's sentencing because it considered him a victim of a federal crime, as defined by Title 18, United States Code 3771(e)(2)(A). At no point during the prosecution of this case did the government regard Mr. Cipriani as a target of the investigation.

If you have any questions, please contact me at the over telephone number.

ANDREW P. YOUNG
Assistant U.S. Attorney
Major Frauds and Public Corruption
U.S. Attorney's Office for the Southern
District of California

EXHIBIT 2



January 15, 2018

Via Email: robinhoodvegas@gmail.com
Mr. Robert Cipriani
1223 Wilshire Blvd. Apt #652
Santa Monica, CA 90403

Mlife Account Number 8328191

Dear Mr. Cipriani,

MGM Resorts International management has determined, after careful consideration, that it no longer desires to accept your business as a customer at its properties ("MGM Resorts Properties"). This decision is effective immediately and a barred status has been placed on your account(s). We hope that you respect management's decision. As a result, should you attempt to conduct any transactions at MGM Resorts Properties, whether gaming (such as placing funds on deposit, gambling in the casino or make reservations through Casino Marketing) or non-gaming (such as attempting to check in, dining in restaurants, going to nightclubs) transactions, you will be reminded of the restriction and asked to leave our premises. In the event that you receive any solicitations or offers to come to any MGM Resorts Properties (whether from MGM Resorts or a third party) or erroneously are permitted to check into a room, such invitations or transaction would have been sent or conducted in error, and they do not supersede or change your barred status.

| | | |
|---|---|---|
| Aria Resort & Casino | Beau Rivage Casino | Bellagio Hotel & Casino |
| Circus Circus Las Vegas | Delano | Excalibur Hotel & Casino |
| Gold Strike Tunica | Luxor Hotel & Casino | Mandalay Bay Hotel & Casino |
| MGM Detroit Casino | MGM Grand Las Vegas Hotel | Mirage Hotel & Casino |
| MGM National Harbor | New York New York Casino | Park MGM |
| MGM Springfield | Signature | Vdara |
| Borgata Hotel & Casino | | |

Any questions concerning your account status should be directed to corporatecompliance@mgmresorts.com.

Sincerely yours,
MGM Resorts International

1                                           PROOF OF SERVICE

2      STATE OF CALIFORNIA            )
                                      )
3      COUNTY OF LOS ANGELES          )

4
             I am employed in the County of Los Angeles, State of California; I am over the age of 18
5      and not a party to the within action; my business address is 369 S. Doheny Drive, Suite 508,
       Beverly Hills, CA 90212.
6

7            On, December 22, 2020, I served the foregoing document(s) described as:

8      **SUMMONS ON FIRST AMENDED COMPLAINT, AND COMPLAINT**

9      On the interested parties to this action by placing a copy thereof attached to an email, addressed as
       follows:
10

11     John McManus
       MGM Resorts International, Inc.
12     6385 S. Rainbow Boulevard, Suite 500
       Las Vegas, Nevada 89118
13
             (BY MAIL)  I am readily familiar with the business practice for collection and
14     processing of correspondence for mailing with the United States Postal Service.  This
       correspondence shall be deposited with the United States Postal Service this same day in the
15     ordinary course of business at our Firm's office address in Los Angeles, California.  Service made
       pursuant to this paragraph, upon motion of a party served, shall be presumed invalid if the postal
16     cancellation date of postage meter date on the envelope is more than one day after the date of
17     deposit for mailing contained in this affidavit.

18           X (BY ELECTRONIC MAIL)  I caused such documents to be delivered via e-mail to the
       offices of the addressee(s) at their respective e-mail addresses, listed here:
19     jmcmanus@mgmresorts.com

20           Executed this 22nd day of December, 2020, at Los Angeles, California.

21
             I declare under penalty of perjury under the laws of the State of California that the above is
22     true and correct.

23
                                                         _____
24                                                               David Berke

25

26

27

28

                                            PROOF OF SERVICE